FILED
05/08/2025
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
March 18, 2025 Session

## STATE OF TENNESSEE v. THOMAS MACK ARNOLD

**Appeal from the Criminal Court for Cumberland County**
**No. 2020-CR-289      Gary S. McKenzie, Judge**

_____

### No. E2024-00900-CCA-R3-CD

_____

Defendant, Thomas Mack Arnold, appeals as of right from his conviction for first degree premeditated murder, for which he is serving a life sentence.  On appeal, Defendant contends that the evidence is insufficient to support his conviction and that the prosecutor made improper statements during the State's rebuttal argument such that a mistrial was necessary.  After a thorough review of the evidence and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Craig Fickling, District Public Defender; Joseph T. Wyatt (on appeal), Assistant District Public Defender; and Robert L. Marlow (at trial), Shelbyville, Tennessee, for the appellant, Thomas Mack Arnold.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip Hatch and Allison Null, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

This case arises from the September 27, 2020 shooting death of Bill Jones (the victim).  The January 2021 term of the Cumberland County Grand Jury charged Defendant with first degree premeditated murder in connection with the victim's death.

- 1 -

The evidence at trial established that the victim; the victim's girlfriend, Mary Ann Crain; Mike Boyko; and his son, Jason Boyko, were visiting Cumberland County for an event called "The Gambler."[1] They stayed at a residence on Christian Road, at which a number of people periodically lived, including the victim's half-brother, Jeff Jones; Chuck Wyatt;[2] Vivian Hurd; and Defendant's wife, Amy Arnold.[3] The victim's other half-brother, Mike Jones; Austin Randolph; and Ms. Arnold's son, Branson Eldridge, also frequented the residence.[4] The State's theory at trial was that Defendant shot the victim because Ms. Arnold accused the victim of stealing her camper trailer, which had been parked on the property and was driven away by an unidentified person on September 27, 2020.

## A. State's Proof

At trial, the Cumberland County Emergency Communications District records custodian identified the 911 call recording from September 27, 2020. In the recording, a man, who identified himself as Jason Boyko, stated that the victim had just been shot in the lower chest, that he was dead or dying, and that he needed an ambulance. Mr. Boyko also stated that he did not know who shot the victim, that the shooter was wearing a "clown mask," and that shooter used a shotgun or rifle. Mr. Boyko stated that the shooter came in "really fast," that he heard unintelligible arguing and scuffling, and that the victim said, "Go ahead, shoot me then," before Mr. Boyko heard a gunshot. Mr. Boyko said that the shooter "got in his car and he peeled out of here." He stated that he did not know any of the six to eight people who were at the house at the time of the shooting because he was only visiting. Mr. Boyko stated that he was the only person remaining in the house with the victim.

Mr. Boyko testified that he was inside the Christian Road residence when the shooting occurred. He said that his father was in the back yard, and "everyone else" was sitting in the living room and talking. Mr. Boyko stated that the residence's back door was the main entry, as the front porch lacked stairs. Mr. Boyko said that, "all of sudden, somebody came through the back door, through the kitchen into the living room." He said there was "a scuffle" between the shooter and the victim that lasted "maybe two seconds."

---

[1] Defense counsel noted during his opening statement that The Gambler was a "[c]ar [r]ally [r]ace."

[2] Although the transcript spells Mr. Wyatt's surname as "White," the technical record reflects that the correct surname is Wyatt.

[3] Defense counsel's opening statement and appellate counsel's oral argument reflect that Ms. Arnold and Defendant were estranged and did not cohabitate at the time of the shooting.

[4] Because the victim and his brothers share a surname, we will refer to Mike and Jeff Jones by their first names for clarity. In addition, because Jason Boyko testified at trial, we will refer to him as Mr. Boyko; because Mike Jones and Mike Boyko share a first name, we will refer to Mike Boyko as "Mr. Boyko's father" for clarity. We intend no disrespect in doing so.

Mr. Boyko stated that the shooter was male and that he was wearing a "crazy clown mask." Mr. Boyko said that he did not know the shooter's identity. Mr. Boyko noted his vision is poor and that he did not have his glasses on, but "it looked like they were potentially wrestling over a weapon." He said then the two men "broke apart" and the victim said, "Well, go on, shoot me," and he heard a shot. Mr. Boyko said that everyone "scattered," that he jumped out of a bedroom window, and that other people exited the nearest door. He stated that he heard car tires "squealing out of there" and that he went back inside to check on the victim. Mr. Boyko said that he was the only person to come back, although he also said that Ms. Crain was still present in the living room. Mr. Boyko estimated that he called 911 within two minutes of hearing the gunshot. Mr. Boyko was the only person at the residence when the police arrived.

Mr. Boyko marked his and the shooter's locations on a crime scene diagram. Mr. Boyko was sitting at the far end of a gray couch in the corner of the living room farthest from the victim. The shooter stood past the far end of the "island bar" separating the kitchen from the living room, which was beside the couch upon which the victim's body was found. Mr. Boyko stated that Ms. Crain was in the kitchen and saw the shooting. Mr. Boyko thought that the victim's half-brother, Mike, was sitting near the victim on a chair beside the open front door. Mr. Boyko said that he "vaguely" remembered Mr. Wyatt standing in the kitchen area near Ms. Crain when the shooting occurred. He commented, "I know the guy with the gun came with a couple of other people," and those people left with the shooter. Mr. Boyko said that he did not know whether Mr. Wyatt came to the house with the shooter but that he knew that he left with shooter. The diagram also indicated that a pocketknife was recovered at approximately the same location as the shooter. Mr. Boyko noted that the "scuffle" took place "right here where his knife was at." Mr. Boyko said that Ms. Crain told him later that the victim had pulled out a knife, but Mr. Boyko did not see a knife.

Mr. Boyko testified that his father told him that "somebody had a gun pointed at him out there in the truck so that he could not warn [them] what was about to happen." Mr. Boyko stated, that after the shooting, he told Ms. Crain and his father to leave and that he would talk to the police. He said his father and Ms. Crain left before he concluded the 911 call. When asked whether his father and Ms. Crain had a reason to leave before the police arrived, Mr. Boyko responded negatively and stated that they were not going to leave before he instructed them to do so.

Mr. Boyko agreed, though, that his father was later arrested for fraudulent use of the victim's debit card. Mr. Boyko testified that he confronted his father about the theft "when [they] were here for court . . . a few months ago" and told him that "it was kind of cold hearted to get the [victim's] wallet." According to Mr. Boyko, his father responded, "Well, [Ms. Crain] got to it before I did[.]" His father told him that the theft occurred while Mr. Boyko was circling the residence after jumping out of the window. Mr. Boyko noted that Ms. Crain had "some sort of brain damage from like an accident she was in when she was

younger" and that she had "this insane obsession . . . with stuff and things[.]"  Mr. Boyko stated that Ms. Crain and his father became "friends with benefits" after the victim's death. He characterized the relationship as a "drug-based fling" to "fill [the] void" left by the victim's death.  When asked whether he knew Ms. Crain's current location, Mr. Boyko responded that he had contact information for her but that he had been in custody for a couple of months and did not know if the information was still accurate.  Mr. Boyko expressed doubt that his father knew Ms. Crain's location because he had been hospitalized recently.

Branson Eldridge testified that he was Defendant's stepson and that, on September 27, 2020, he had been living at the Christian Road residence but was in the process of moving out.  Mr. Eldridge said that "all sorts of people" lived at the residence and that "[t]here were people in and out of there all day."  Mr. Eldridge said that, on the morning of the shooting, Mr. Boyko, Mr. Boyko's father, Ms. Crain, Mike, and the victim were "moving the whole house out."  He stated that he was trying to get "all of [his] stuff out, trying to not lose anything more than what [he] already had."   He said, "[M]y Jeep Cherokee and my four-wheeler were gone."

Mr. Eldridge testified that Ms. Arnold had removed her belongings from the residence on September 26 and 27 and that she had placed them in her camper.  He said that he and Ms. Arnold planned to take their things to Josh Huston's house.  Mr. Eldridge stated that he made three trips to Mr. Huston's house on the day of the shooting and that, after the last trip, he saw that Ms. Arnold's camper was gone.  Mr. Eldridge said that he removed a DVR connected to the residence's surveillance cameras in his first load of belongings.  He acknowledged that Ms. Arnold told him to get the DVR in a text message, although he denied that he removed it as a result of her request.  Mr. Eldridge noted that the surveillance cameras were also his and that he had intended to remove the cameras as well, although he did not return to do so after the shooting.

Mr. Eldridge stated that, around 6:00 p.m. on September 27, he was in the front yard loading his Jeep with laundry baskets full of his personal items when Ms. Arnold drove up to the residence in her dark-colored Honda Accord.  Mr. Eldridge stated that the last time he saw the victim and Mike before Ms. Arnold and Defendant arrived at the residence, they were outside on the front porch.  Mr. Eldridge said that Defendant exited the passenger side of the Honda and walked behind the residence.  Mr. Eldridge said he did not remember telling the police that Defendant had "hopped" out of the car with a bag, began running up the hill, and pulled something out of the bag.  Mr. Eldridge testified that he was uncertain whether Defendant had a bag or backpack, although he agreed that, if he had told the police as much, it was true.  When asked whether he was truthful in his police statement, Mr. Eldridge responded, "No, sir."  He agreed that he was "sticking with" his trial testimony, as opposed to what he remembered at the time of the shooting.

Mr. Eldridge testified that he heard people screaming and that the scene became chaotic. Mr. Eldridge stated that Defendant emerged from behind the house and that Defendant and Ms. Arnold got into the Honda. Mr. Eldridge denied that Defendant was wearing a clown mask when he exited the car or when he returned to it after the shooting. Mr. Eldridge also denied that Defendant had a "long gun." Mr. Eldridge said that after he heard the gunshot, he and Mr. Randolph got into the Jeep, and Mr. Eldridge drove them to Mr. Huston's house. He said that Ms. Arnold and Defendant followed them as they left the property in Ms. Arnold's Honda and that Ms. Arnold later met them at Mr. Huston's house.

Mike Jones testified that the victim was his brother and that, earlier on the day of the shooting, Ms. Arnold "had a few words" with an unnamed person "about a credit card[.]" Mike stated that, about two hours before the victim was shot, Ms. Arnold returned and shot at "us" with a pistol from a vehicle on the road in front of the Christian Road residence. When asked whether anyone called the police, Mike responded, "No, I didn't think nothing about it. I just thought it was just acting stupid[], or whatever."

Mike testified that, before the victim was shot, Mr. Eldridge and Mr. Randolph were in the front yard of the Christian Road residence working on a vehicle. He said that he saw Ms. Arnold pull up in a dark-colored car with Mr. Wyatt and a shorter man, who was "a little chunky built" with a dark beard and bushy mustache. Mike said that the shorter man was wearing a hat or bandana covering his face and carrying a shotgun. Mike saw the two men enter the residence. He estimated that Mr. Wyatt and the shorter man were inside for less than five minutes before the shooting occurred. Mike stated that he was sitting in a recliner beside the victim, who was sitting on the couch, and that the shorter man shot the victim with his shotgun and then left through the back door. Mike stated that he went out the front door, off the porch, and into the woods. Mike noted that everyone "scattered" and that he did not know where they went. Mike testified that he went down the road to call for help and that he later returned to the residence to talk to the police.

On cross-examination, Mike testified that, earlier on the day of the shooting, he saw a camper being "pulled off." He said that he was busy at the other side of the house and did not see who hooked up the camper and towed it away. Mike claimed he did not know why the camper was towed away and "didn't think nothing about it, because there was a lot of buy[ing], selling, trad[ing] cars, vehicles, and different things." Although Mike agreed that Jeff owned several guns, he claimed that he did not see any guns in the house while he was there. Mike denied knowing about a 12-gauge double-barrel shotgun Jeff "acquired" one or two days before the shooting. He said that, if he had noticed a gun, he would have "probably used it" to retaliate against the shooter.

When asked whether a physical altercation occurred before the shooting, Mike stated,

They never had no physical, as far as touching each other, or whatever. They, they did have a few words. Um, it wasn't screaming or hollering, the best I can remember. And when [the victim] stood up, that's when the shot occurred, where he was sitting on the couch.

. . . .

[The victim] told him to shoot him. He said, "Shoot me," when he was standing up, and that's when he shot him.

Mike stated that he did not see anyone hit the victim; similarly, he denied seeing the victim pull out a knife. Mike said that he did not see a knife on the floor underneath the victim's hand; he noted that he did not "inspect" the victim because he was worried about leaving before he was shot. He did not know the order in which people left the property.

Ryan Christopher Snow testified that he was at home in Van Buren County on September 27, 2020, around dusk when he went outside and saw Defendant getting out of a small pickup truck in which Defendant was a passenger. Mr. Snow said he was not familiar with the driver or truck. According to Mr. Snow, Defendant "started freaking out about his [wife], he'd broke up with her, or she had done something." Mr. Snow recalled that Defendant said he needed to go to Florida to see his mother and daughter and offered Mr. Snow $250 to drive him there. Mr. Snow noted that Defendant's mother had recently moved and that Mr. Snow had not found the request to be unusual.

Mr. Snow agreed to drive Defendant to Florida. He said that Defendant was supposed to pay him when they arrived. Mr. Snow stated that Defendant was "pretty impaired" and fell asleep in the backseat when they left Mr. Snow's driveway and did not wake up until they were pulled over. He denied that Defendant made any statements during the drive before they were pulled over by police in Georgia.

Mr. Snow stated that he was stopped by the police in Georgia and that a Georgia officer asked if he knew why he was there and "what was going on." A few hours later, a Tennessee Bureau of Investigation (TBI) agent interviewed him at the Georgia police station. Mr. Snow stated that the TBI agent asked whether Defendant had a gun and that he responded that Defendant only had a small backpack, which was in his car. When asked whether the TBI agent looked at the backpack, Mr. Snow responded that he gave officers consent to search his car. Mr. Snow said that he opened the backpack at some point and found cologne, reciprocating saw blades, a hat, a pocketknife or two, a flashlight, and "some odds and ends." He denied finding a clown mask.

Cordele (Georgia) Police Department Officer Michael Telfair testified that around 4:00 a.m. on September 28, 2020, he participated in Mr. Snow's traffic stop. Officer Telfair

stated that he helped Defendant out of the car and detained him. He said that, although he asked Defendant no questions, Defendant made statements to him.

A series of seven recording clips from Officer Telfair's body camera were received as an exhibit; Defendant's statements were difficult to hear on the clips because of a significant amount of road noise and cross-talk from police dispatch and other officers. In the first clip, Defendant asked, "What's this about, man?" In the second clip, Defendant twice stated, "This is s--t coming out of Tennessee." In the third clip, Defendant addressed a handcuffed man who was standing at the opposite end of the car from him, presumably Mr. Snow, and said, "Sorry, man, y'all didn't know." In the fourth clip, Defendant stated, "Man, before y'all take me in, can I call my mom and dad in Florida? That's all I was wanting to do, man, just to see my mom and dad. Self-defense s--t." Officer Telfair told Defendant that once they reached the police station, they would decide whether he was allowed a phone call. In the fifth clip, Defendant asked, "They going to extradite me right away?" In the sixth clip, some of Defendant's speech is unintelligible. The part of the statement that was audible was as follows: ". . . stole my damn camper trailer, man. I went over there to confront him about it, and he pulled a knife on me . . . . I ain't no cold-blooded killer . . . what happened, man, and I'm sorry . . . . self-defense." In the seventh clip, Defendant stated, "They ain't done nothing, man, they don't even know nothing."

Officer Telfair agreed that Defendant asked him the reason for the traffic stop and that his training dictated that he not provide information to Defendant. Officer Telfair testified that Defendant's statements were spontaneous and not based upon anything he or the other officers told Defendant. Officer Telfair said that, about ten minutes after Defendant was removed from the car, Defendant stated "that he had went to confront somebody about somebody stealing his camper trailer, and the guy pulled a knife on him, and it was self-defense."

On cross-examination, Officer Telfair testified that Defendant was cooperative and did not argue, struggle with him, or try to run away. Officer Telfair stated that Defendant was initially detained and that, after he was identified, he was placed into custody. He agreed that Defendant had not been told with what offense he was being charged. Officer Telfair stated that, to his knowledge, no weapons were found in the car; however, Officer Telfair said that he removed a set of chrome knuckles from Defendant's pocket. He did not know whether the TBI agent investigating the case collected the knuckles or Defendant's personal property after it was turned over to the jail, although that would have been standard procedure. Officer Telfair said that the officers did not talk about the reason for the stop among themselves.

TBI Special Agent Steven Luke Webb testified that he investigated the victim's death and visited the crime scene on September 27, 2020. Defendant was not present at the crime scene during the investigation. Special Agent Webb stated that he had preliminary information that "a man . . . came into the home with a clown mask [on] and a

shotgun." Special Agent Webb identified photographs of the inside and outside of the residence. Special Agent Webb described the layout of the residence consistently with the crime scene diagram, which Special Agent Webb said he drew. Special Agent Webb opined that, based upon the witness testimony that the shooter fired the gun while standing between the living room and dining room, the shooter's location was "much further" away than where Mr. Boyko's marking on the crime scene diagram indicated. Special Agent Webb said that the distance he measured between the location from where the shooter fired and the victim's body and the knife was about seven feet. Special Agent Webb stated that an open pocketknife was found on an air vent beside the couch and the victim's body.

Special Agent Webb testified that he found "copper jacketing" and black "wadding" from a shotgun "slug" underneath the victim's body and that he moved them to a table to be photographed. Special Agent Webb said that his investigation indicated the bullet went through the victim's body and out the front wall of the residence, which was consistent with the shooter's reported location.

Special Agent Webb testified that the 911 call was placed at 6:22 p.m. central time. He stated that, although some witnesses were located or came back to the scene later that evening, Defendant was found at 2:50 a.m. central time in Cordele, Georgia. Special Agent Webb said that he was informed about Defendant's claim to Georgia investigators that he had acted in self-defense. Special Agent Webb stated that he reviewed the autopsy report, the photographs, the witness statements, and cell phone records from Defendant and Ms. Arnold. Special Agent Webb identified cell phone numbers belonging to Defendant, Ms. Arnold, Mr. Randolph, and Mr. Eldridge. He stated that the relevant text messages began at 4:11 p.m. central time.

The following relevant text messages were sent:[5]

| Time | From | To | Text |
|------|------|----|------|
| 4:11 p.m. | Ms. Arnold | Mr. Randolph | I think [the victim] took my camper and your car and left . . . Mike's blue truck was pulling my camper . . . |
| 4:28 p.m. | Ms. Arnold | Mr. Randolph | Where are y'all at |
| 4:28 p.m. | Ms. Arnold | Mr. Randolph | Hello |

---

[5] The testimony indicated that the times listed on the telephone records corresponded to eastern time; Cumberland County is located in the central time zone, so we will use central time in this table. Additionally, unless indicated, the text messages have not been altered to correct typographical errors. The ellipses in the messages are original.

| 4:28 p.m. | Mr. Randolph | Ms. Arnold | He may have and we are in [Tansi] |
|---|---|---|---|
| 4:36 p.m. | Mr. Randolph | Ms. Arnold | Do we need to go catch a camper |
| 4:37 p.m. | Ms. Arnold | Mr. Randolph | Yes they stole it |
| 4:37 p.m. | Ms. Arnold | Mr. Eldridge | [The victim] took my G-d d--n camper |
| 4:42 p.m. | Ms. Arnold | Mr. Randolph | If you want your car you better get your dumb a--overthere |
| 4:43 p.m. | Ms. Arnold | Mr. Eldridge | Call [Defendant] and tell him to be on stand by . . . . I am gonna let him beat the brakes off [the victim] . . .  Tell me what is left there of [the victim]'s |
| 4:44 p.m. | Mr. Eldridge | Ms. Arnold | Call Jeff and see what's goin on |
| 4:45 p.m. | Ms. Arnold | Mr. Eldridge | He said he doesn't know but my camper is gone and [the victim] isthere |
| 4:56 p.m. | Ms. Arnold | Mr. Eldridge | Bob is taking Chuck to the house and he said he is takingjeff truck and going to get my camper |
| 5:06 p.m. | Ms. Arnold | Defendant | Where are you |
| 5:06 p.m. | Ms. Arnold | Defendant | I need you asap |
| 5:08 p.m. | Ms. Arnold | Mr. Eldridge | Go in living room and get that DVR unplug it and take it to your car plz . . . |
| 5:08 p.m. | Ms. Arnold | Mr. Eldridge | I called [Defendant] and taco |
| 5:08 p.m. | Ms. Arnold | Mr. Eldridge | I'm coming over there and shooting holes in every vehiclethat is his these |
| 5:08 p.m. | Ms. Arnold | Mr. Eldridge | There |
| 5:09 p.m. | Mr. Eldridge | Ms. Arnold | I'm checking at mikes in critter creek rn |
| 5:10 p.m. | Ms. Arnold | Mr. Eldridge | Chuck passed it on lantana an hour ago |
| 5:10 p.m. | Ms. Arnold | Mr. Eldridge | Go back get DVR |

| 5:11 p.m. | Ms. Arnold | Mr. Eldridge | It's on its way to there house |
|---|---|---|---|
| 5:11 p.m. | Mr. Eldridge | Ms. Arnold | It's not there and he loaned it to a buddy and [the victim] wantlet him say who |
| 5:12 p.m. | Ms. Arnold | Mr. Eldridge | Was both those other guys there ? |
| 5:12 p.m. | Ms. Arnold | Mr. Eldridge | Or who all was gone from there pack of idiots |
| 5:12 p.m. | Ms. Arnold | Mr. Eldridge | Jeff wasn't doing anything about it |
| 5:17 p.m. | Mr. Eldridge | Ms. Arnold | I thought no that Mike guy is gone and Jeff's goin to lookfor it rn he asked them none of them will say anything I'm bout to get them to spill the beans rn |
| 5:18 p.m. | Ms. Arnold | Mr. Eldridge | I'll be there in a minute and I'll start shooting mfers andthey will start talking |
| 5:18 p.m. | Ms. Arnold | Mr. Eldridge | But that place is under video surveillance and I know theyare headed to there house with it |
| 5:19 p.m. | Mr. Eldridge | Ms. Arnold | I guarantee they are |
| 5:19 p.m. | Ms. Arnold | Mr. Eldridge | Where is [the victim] |
| 5:20 p.m. | Mr. Eldridge | Ms. Arnold | In the yard |
| 5:21 p.m. | Ms. Arnold | Mr. Eldridge | Is he fixing to leave |
| 5:22 p.m. | Mr. Eldridge | Ms. Arnold | No |
| 5:22 p.m. | Mr. Eldridge | Ms. Arnold | He's loading this trailer |
| 5:49 p.m. | Ms. Arnold | Mr. Eldridge | Have they left yet |
| 5:50 p.m. | Mr. Eldridge | Ms. Arnold | No |
| 6:01 p.m. | Defendant | Ms. Arnold | I'm headed towards you g**d*** dont stop I gir my sling shot lol we good trust me I love u |

| 6:02 p.m. | Defendant | Ms. Arnold | Hey baby I'm passing Sherwood n ou w talk to |
|---|---|---|---|
| 6:02 p.m. | Defendant | Ms. Arnold | Me pls I'm going with u we in black jeep liberty |
| 6:02 p.m. | Defendant | Ms. Arnold | Answer me think I just passed then GB oddamit talk to mr |
| 6:26 p.m. | Ms. Arnold | Mr. Eldridge | Go to Joshs now |

The flash drive containing Ms. Arnold's cell phone data reflected that she called Defendant three times between 4:13 p.m. and 5:05 p.m. on September 27, 2020; the respective calls were 27 seconds, 119 seconds, and 30 seconds. Defendant called Ms. Arnold five times between 4:37 p.m. and 6:09 p.m.; four of the five calls were less than ten seconds in duration, and one was 19 seconds.

On cross-examination, Special Agent Webb testified that, by the time he arrived at the crime scene, first responders had moved some furniture and items while attending to the victim. He said, though, that the first responders confirmed they had not moved the pocketknife near the couch.

Special Agent Webb testified that they did not find a spent shell casing, cap, or primer at the scene. He explained that, based upon the lack of a shell casing, the shotgun used to shoot the victim was a "pump" or "breech gun" that required pumping or manual removal of spent shells. He noted that, alternatively, someone could have picked up the shell casing after an automatic shotgun ejected it. Special Agent Webb said that no other guns or ammunition were found at the house. Upon being shown a photograph of a box from the residence labeled "Remington," Special Agent Webb explained that it did not have "anything to do with firearms" and contained "power fasteners" for drywall.

Special Agent Webb did not remember if the victim's wallet was found at the scene; he noted that, if it were in the victim's pocket, it would have been transported with the victim's body to autopsy. He did not recall looking through the wallet personally. Special Agent Webb stated that the medical examiner found a $5 bill and other loose bills in the victim's pocket when the medical examiner rolled the victim's body over. Special Agent Webb stated that he would remember if $500 cash was found in the victim's wallet. He recalled that a quantity of cash was in Defendant's wallet when he was arrested in Georgia.

Special Agent Webb agreed that Mr. Boyko, Mike, and another man returned to the crime scene but that he had to "chase down" interviews with Ms. Crain, Mr. Boyko's father, Mr. Randolph, and Mr. Eldridge. Special Agent Webb stated that he did not interview the

neighbors across the street from the residence. He said that he attempted to interview Mr. Wyatt, but Mr. Wyatt declined to speak to him. Special Agent Webb stated that subpoenas were issued for Mr. Boyko's father and Ms. Crain, and he agreed that defense counsel provided him with addresses for Ms. Crain. Special Agent Webb further agreed that defense counsel did not hinder him from being able to meet with Ms. Crain or Mr. Eldridge. Special Agent Webb stated that he interviewed Ms. Arnold several times at the courthouse and that she gave "different stories." He noted that he only interviewed other witnesses once and could not opine on the consistency of their statements. Special Agent Webb said that he attended the State's trial preparation meetings with the witnesses, which was a normal practice. Special Agent Webb agreed that he and the attorneys on the case could not require people to talk to them.

Special Agent Webb agreed that many of Ms. Arnold's text messages on September 27 were exchanged with Mr. Eldridge and Mr. Randolph. Special Agent Webb further agreed that, prior to 5:00 p.m., "there wasn't much communication between" Defendant's and Ms. Arnold's cell phones.

Special Agent Webb identified two photographs, which reflected a bullet defect in the wall beside the front door; the hole went through the wall and had a thin yellow rod protruding from both sides; Special Agent Webb noted that officers had placed the yellow rod. Special Agent Webb opined that, based upon the bullet's path, the victim was standing near the couch when he was shot. He stated that, based upon the yellow rod, the bullet's path through the wall was at a straight or slightly upward angle. Special Agent Webb estimated that the shooter stood in the same location where he stood to photograph the living room from the threshold of the kitchen. Special Agent Webb drew an arrow on a photograph of the living room, in which the island bar wall was also visible, to indicate his estimation of the shooter's location.

Special Agent Webb testified that, two or three weeks after the shooting, Ms. Arnold provided law enforcement with the DVR from the residence. Special Agent Webb stated that, although the recording began several weeks before the shooting, the recording ended about an hour and a half before Mr. Boyko called 911. Special Agent Webb agreed that, according to the recording, Jackie Martin, Jr., and Jackie Martin, Sr., came to the residence's back door on September 26, 2020; Special Agent Webb thought that it showed Jeff giving a 12-gauge double-barrel shotgun to one of the men.

On redirect examination, Special Agent Webb stated that the potential area in which a shooter stood became larger if the shooter fired further from the bullet defect. He circled a larger area shown in the living room photograph as an area in which the shooter may have stood. Special Agent Webb described Defendant as a "short chunky man."

On recross examination, Special Agent Webb said that he did not know if the shooter was right- or left-handed. He stated that Defendant was right-handed. Special

- 12 -

Agent Webb acknowledged that Ms. Arnold did not say that she wanted Defendant to shoot the victim, only beat him. Special Agent Webb said that no ballistics reconstruction had been performed in this case. Special Agent Webb said, "The only thing I can say for sure [is] that it was not a close shot." He stated that, depending on the barrel length of a firearm, a contact gunshot wound or one inflicted within three to five feet would cause stippling and burn marks, respectively, on a victim.

Special Agent Webb theorized that the copper jacketing and wadding fell out of the victim's chest when Mr. Boyko and EMS workers touched him. Special Agent Webb stated that it was "maybe" possible that the jacketing and wadding would not have been found on or underneath the victim's body if he had been shot from twenty feet further away.

Davidson County Senior Associate Medical Examiner Dr. Thomas Deering, an expert in forensic pathology, testified that he performed the victim's autopsy. He determined that the cause of death was a shotgun wound to the chest and that the manner of death was homicide. Dr. Deering testified that the victim's toxicology tests reflected that the victim had alcohol, methamphetamine, and amphetamine in his system. Dr. Deering denied that methamphetamine or alcohol use were contributing factors to the victim's death.

Dr. Deering testified that the projectile entered the right anterior lower chest and that the large entrance wound was "very characteristic of a shotgun wound." He noted that the projectile "may have been a slug" because he found no birdshot or buckshot. The projectile injured the lower right lung, "heavily fragmented" the liver, and fractured or tore the right kidney, right adrenal gland, diaphragm, and a couple ribs. Dr. Deering noted that the victim had cirrhosis of the liver. Dr. Deering identified an x-ray of the victim, which showed small bits of metal around the victim's liver; he noted that he was unable to recover the pieces during autopsy.

Dr. Deering testified that the projectile exited the right back "about at the same level and a little closer to [the] spine than the entrance was." Dr. Deering stated that he recovered pieces of plastic and wadding from inside the wound "track." Dr. Deering did not find soot or stippling; he noted that the victim's clothing was not thick but that, because his shirt was a dark color, "if there happened to be soot there, it would definitely get soaked up[.]" He stated that the wound's irregular shape indicated that the shot was fired from "at least several feet away."

Dr. Deering testified that he found about two liters of blood in the victim's chest and abdomen. He estimated that the victim bled to death in fewer than thirty minutes.

On cross-examination, when asked whether the victim would have lived if he had received immediate medical attention, Dr. Deering responded, "Probably not, because his liver [was] already severely diseased, and it was fragmented" such that stopping the

bleeding would have been difficult. Dr. Deering could not estimate when the victim last used methamphetamine based upon the amount in his blood; he noted, though, that there was more methamphetamine than amphetamine, its metabolite. Dr. Deering opined that the victim used it "sometime during that day for sure." Dr. Deering characterized the amount of methamphetamine in the victim's system as "a little bit" and noted that he had seen "much higher levels" in other cases. Dr. Deering said that the victim's blood alcohol content was 0.05. Dr. Deering stated that he could not determine how the victim was behaving but that methamphetamine, a stimulant, could "be really unpredictable" in its effects and that it had been combined with alcohol, a depressant.

Dr. Deering testified that he had failed to note in the autopsy report an abrasion underneath the victim's bottom lip on the left side. Dr. Deering said that, when he pulled the lip forward to photograph it, he found "a pretty nasty laceration or tear" inside the lip resulting from "an injury . . . that was enough that it kind of smashed against his tooth and caused the inside of his lip to be cut." He denied that the tooth was chipped. Dr. Deering stated that because the wound was red and actively bleeding, it occurred before or at the same time as the victim's death. Dr. Deering stated that the wound was a blunt force trauma that could have resulted from the victim's being struck by something or the victim's falling and hitting something. Dr. Deering agreed that the injury could have been caused by a fist or a person using brass knuckles.

Dr. Deering testified that bullets typically were not deflected even by hitting bone and that the projectile in this case was "a straight through and through." Dr. Deering stated that the projectile's trajectory was "a little bit from [the victim's] right to left" and "fairly level" in height. Dr. Deering opined that the end of the shotgun barrel would have been to the victim's right, depending on the shooter's body position. Based upon the presence of the plastic and wadding inside the back portion of the wound track, Dr. Deering estimated that the end of the shotgun's barrel was between five and ten feet away from the victim.

*B. Defendant's Proof*

After the State closed its proof, Defendant called E.D.[6] as a witness. E.D. testified that he and his family lived across the street from the residence where the shooting occurred; he estimated that the houses were about one football field's length apart. E.D. was fourteen years old at the time of the shooting. E.D. stated that, on September 27, 2020, he was eating pizza on his back porch and looking at his phone when he heard a gunshot. He said that he had seen people loading up vehicles that afternoon; he noted that "there's always cars in and out of" the residence. E.D. stated that he had not been paying attention to the residence before the gunshot. He said that he spoke to the police that evening and that an officer wrote down his statement. E.D. identified a hand-drawn diagram of the residence as one the officer drew in response to his statement.

---

[6] It is the policy of this court to protect the identity of minors by referring to them using their initials.

E.D. testified that a black Chevrolet truck was parked to the left of the residence; a white Jeep was parked in front; and a black four-door car pulled up the driveway to the right of the residence. He stated that three or four people got out of the car; he did not remember if they were women or men. E.D. later said, though, that he did not remember how many people were in the car. E.D. stated that he would have remembered if someone from the car was wearing a clown mask. He agreed that his police statement did not include his having seen a clown mask.

When asked whether he would have remembered seeing someone exit the car carrying a shotgun, E.D. stated that he was not paying that much attention. He agreed that, if he had seen a gun after hearing the gunshot, he would have remembered it. E.D. noted that, although he did not remember seeing any guns around the time of the shooting, he saw someone load "some boxes of guns" into the white Jeep thirty or forty-five minutes before the shooting. E.D. did not know who owned the Jeep or whether he had seen it before. E.D. stated that the Jeep returned after departing with the guns. E.D. said that he knew who Mr. Randolph and Mr. Eldridge were but that he was uncertain whether they were present that afternoon. He noted that the residence was too far away to "pick out who was who."

On cross-examination, E.D. testified that the distance between his porch and the residence where the shooting took place was such that it was difficult for him to see whether someone was wearing specific clothing or had certain physical characteristics. E.D. agreed that he wore a backpack at school and was familiar with guns from hunting. He further agreed that some shotguns were shorter and could fit in a backpack.

E.D. agreed that, in his police statement, he recounted that he saw a person exit the black car and walk around the back of the house just before he heard the gunshot. E.D. further agreed that, afterward, the person got back into the black car, and it left.

On redirect examination, E.D. averred that his testimony was based upon his memory of the incident and not his police statement. He did not recall whether a woman was driving the black car or which car door the person who exited the car used. He similarly did not recall whether more than one person got out of the car or reentered it.

Harlan Phillips testified that he was in custody and that he had numerous theft convictions and one drug charge. Mr. Phillips stated that he stole trailers, cars, and anything he could sell. Mr. Phillips testified that, on the evening of September 26, 2020, he and Defendant went to Anderson County, where they used a battery-operated reciprocating saw to steal catalytic converters and sell them.

Mr. Phillips did not recall whether Defendant spent the rest of the night with him, but they moved furniture together on the afternoon of September 27 and rode around in Mr. Phillips' truck. Mr. Phillips testified that, on the afternoon of September 27,

- 15 -

Defendant did not have a gun or backpack with him. He stated that Defendant always carried a "zip bag" that could hold "a slingshot . . . . That's about it." Mr. Phillips said that Defendant got a call and wanted to be dropped off, so he took Defendant to the Dollar Store, which was eight to ten minutes away from the Christian Road residence, between 5:00 and 6:00 p.m. Mr. Phillips did not know who called Defendant, and Defendant did not say anything about "what he had to do[.]" Mr. Phillips left immediately and did not know whether anyone was waiting to pick up Defendant. Mr. Phillips did not see or hear from Defendant until they were both in jail.

On cross-examination, Mr. Phillips acknowledged that he had six prior convictions for theft over $1,000. Mr. Phillips noted that Defendant sometimes stayed with him and was otherwise "living at the river." Mr. Phillips recalled telling the police that Defendant was supposed to meet a woman at the Dollar Store and go to Cookeville on the night of September 27.

On redirect examination, Mr. Phillips testified that he believed that the woman Defendant was supposed to meet called Defendant just before Defendant requested to be dropped off. When asked the nature of Defendant's relationship with the woman, Mr. Phillips stated that they "hung out like a week before that and went on like a little vacation[.]" Mr. Phillips did not talk to Ms. Arnold that day; he noted that he did not like Ms. Arnold.

Mr. Phillips stated that, the night before he testified, he sent a text message to Ms. Hurd, who was "riding around" with Ms. Arnold and using her cell phone, about sending him money for his jail text messaging device. According to Mr. Phillips, Ms. Arnold told him that court had gone well that day, and he said, "That's what I heard."

Jackie Lynn Martin, Sr., testified that he was currently in custody. Mr. Martin stated that he and his son had previously lived at the Christian Road residence, along with Mike, Jeff, and a "handful" of people he could not name. He stated that, on September 26, 2020, he and his son came to the residence; Mr. Martin's son sold Jeff a 12-gauge double-barrel, break action shotgun in exchange for a forty-dollar bag of methamphetamine and forty dollars in cash. Mr. Martin stated that the gun did not automatically eject spent shell casings. Mr. Martin said that the residence was "just a good place to go sell" guns and that he had known Jeff all his life. Mr. Martin stated that it was the first time he had sold Jeff a gun. Mr. Martin testified that Jeff had "a few guns," including a 12-gauge pump shotgun in which Mr. Martin was interested; however, Jeff did not want to trade for it.

Mr. Martin testified that he had been convicted of a felony; when defense counsel observed that it was illegal for him to own or possess a gun, Mr. Martin remarked that the shotgun belonged to his son. Mr. Martin stated that he and his son both used methamphetamine. He was unaware that the property had surveillance cameras.

Vivian Hurd[7] testified that, although she was not in custody, she had previous convictions for aggravated burglary and theft over $10,000; she said that on September 27, 2020, she was on probation and knew "there was a violation out for [her]." Ms. Hurd stated that she had been staying at the Christian Road residence with Mr. Wyatt for six months at the time of the shooting. She said that, before the victim and his companions arrived, the household consisted of her, Mr. Wyatt, Jeff, Mr. Eldridge, Mr. Randolph, and "a bunch of riff-raf[f.]" Ms. Hurd stated that Ms. Arnold had previously lived there, but that she left to go to a rehabilitation program. She said Ms. Arnold returned after she left rehabilitation. Ms. Hurd stated that Ms. Arnold stayed in Jeff's bedroom, and Jeff slept in a recliner.

Ms. Hurd testified that she set up the surveillance cameras, which recorded as long as they were connected to power. Ms. Hurd stated that there were two cameras at the back of the house, which were aimed at the back door and the driveway, and three in the front that captured the entire front yard. Ms. Hurd stated that she left the residence around 11:00 a.m. on the morning of September 27, 2020, to spend the day with an elderly woman and cook for her. Ms. Hurd was not present at the time of the shooting and learned about the victim's death when her friend came to the elderly woman's house that night.

Ms. Hurd testified that, "a couple of days" prior to the shooting, she was present when Mr. Martin and his son were at the residence and traded a pump shotgun for methamphetamine and cash. Ms. Hurd stated that the shotgun was not loaded, that she brought it into the house and gave it to Jeff, and that Jeff loaded the gun with a "slug." Ms. Hurd said that she asked Jeff about a "silencer shell" and that he said, "No, this right here will take a man down." She stated that Jeff told everyone not to touch it and placed it beside his recliner, which was in front of the entrance to the kitchen. Ms. Hurd said that the shotgun was kept there or behind the door of the bedroom. Ms. Hurd stated that when she left on the morning of September 27, the shotgun was behind the bedroom door, and the cameras were working. Ms. Hurd averred that she had no reason to expect that anything was going to happen when she left.

Ms. Hurd testified that she was at Mr. Huston's house ten or twelve days after the shooting when Ms. Arnold crawled underneath the house to retrieve the DVR from the residence. Ms. Hurd voluntarily provided the police with the security system's password. Ms. Hurd stated that, although she had testified on direct that she had no knowledge that anything was going to happen when she left the residence, she gave contradictory information to Special Agent Webb in an interview. Ms. Hurd admitted that she had been using methamphetamine on September 27, 2020. Ms. Hurd denied talking to anyone about what she would say at trial.

---

[7] Ms. Hurd used her married surname at the time of trial, but the transcript contains only a phonetic spelling; for clarity, we will refer to her using the surname she used at the time of the shooting. We intend no disrespect in doing so.

## C. State's Rebuttal Closing Argument

During the State's rebuttal argument, the prosecutor stated as follows:

> The proof shows that [Defendant] was stopped in Cordele, Georgia, eight and a half hours after [the victim] was shot in the chest with a shotgun by [Defendant]. Eight and a half hours. That's a five-hour drive from Cumberland County, or more. Actions speak louder than words.

> [Defendant] tells the officer, "Self-defense." After saying he goes to confront the man about a stolen camper trailer, and he pulled a knife on him. That is how we know that [Defendant] is the one that shot a hole through [the victim], when he came in with a mask and a shotgun, because the camper trailer had been taken. Actions speak louder than words.

> . . . .

> Now, [defense counsel] can get up and stomp around and say, no ID, two times already in this closing argument. I clearly explained to you that there's proof beyond a reasonable doubt that this is a premeditated first degree murder committed by [Defendant]. He says he's the one that shot him by saying, "Self-defense," when he pulled the knife on him. Those are not my words. They are not. Those are the words of [Defendant] eight hours away, eight hours after a crime, five hours away from the scene of the murder. He said, "I shot him in self-defense because he pulled a knife on me."

At this juncture, defense counsel objected, stating, "He did not say, 'I did it in self-defense.' All he said was, 'Self-defense.'" The trial court issued the following curative instruction:

> All right, so, ladies and gentlemen of the jury, closing arguments is the time for the attorneys to express to you their understanding of what the evidence is. If you find that any comments that are made during closing argument are not reconciled with the evidence, you should disregard them, as the comments of the attorneys are not evidence.

> Okay, General, you may proceed.

The prosecutor continued, "'He pulled the knife on me. Self-defense.' Actions speak louder than words."

*D. Verdict/Motion for New Trial*

The jury convicted Defendant as charged, and the trial court imposed a mandatory life sentence. Defendant filed a timely motion for new trial.

At the motion for new trial hearing, the trial court found the following relative to Defendant's contention that court should have declared a mistrial after the State's rebuttal argument:

> The prosecution's statement in it, certainly there was no intent. It was a statement in regards to [D]efendant saying it was self-defense, and that would have been a very logical inference from the evidence that was presented at trial when the defendant made the statement and brought up self-defense to an officer in response to questioning about -- or in response to him wanting to know why he was being detained and arrested in another state. So, it's a very easy reference to draw, that the jury did draw, that [D]efendant's statement, "That was self-defense" was indicating that his involvement was in a self-defense scenario. And so I don't find any prejudice or anything that the [S]tate, that the prosecution did in that closing argument that would warrant a new trial.

The trial court denied relief, and Defendant timely appealed.

## II. Analysis

### *Sufficiency of the Evidence*

On appeal, Defendant contends that the evidence is insufficient to support his conviction.[8] He initially frames his sufficiency issue as stemming from the State's failure "to demonstrate any reasonable and legitimate inferences that [he] acted with premeditation." Defendant argues that "the jury in this case made an irrational and egregious error in finding that [Defendant] acted with premeditation" and that no rational trier of fact could have found the existence of premeditation beyond a reasonable doubt.

Defendant additionally argues that "[o]f . . . twelve witnesses, none of them provided a positive identification of [Defendant] inside the residence[.]" Defendant further submits that "[e]ach witness . . . seemed to contradict the testimony of the witness before"

---

[8] We note that Defendant did not raise the sufficiency of the evidence in his motion for new trial; however, we extend plenary review to the sufficiency of the evidence even when raised for the first time on appeal. *See State v. Stafford*, No. W2024-00637-CCA-R3-CD, 2025 WL 399856, at *6 (Tenn. Crim. App. Feb. 4, 2025) (citing Tenn. R. App. P. 3(e); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989); *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984)).

and that the testimony was inconsistent as to whether a struggle occurred, what kind of face covering Defendant wore, whether a shotgun was in the house, or whether the victim pulled out a knife. He notes that the trial evidence established the existence of several interpersonal conflicts unrelated to Defendant and that "this entire case minimally involves [Defendant]."

The State responds that the evidence of premeditation was sufficient; it does not address Defendant's identity argument.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2020). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2020). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2020). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

"Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have long recognized that premeditation may be proved by circumstantial evidence . . . and may be inferred from the manner and circumstances of the killing[.]" *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (internal citations and

quotation marks omitted). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Our supreme court has discussed that "numerous specific circumstances . . . may bear on the existence of premeditation," including,

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). However, this "list of specific circumstances developed through Tennessee caselaw is not exhaustive," and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (citing *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004)); *see Davidson*, 121 S.W.3d at 615; Tenn. Code Ann. § 39-13-202(e). "Ultimately, then, premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after

the exercise of reflection and judgment." *Reynolds*, 635 S.W.3d at 917 (internal citations and quotation marks omitted).

We note that, in this case, the trial court instructed the jury on self-defense at Defendant's request. "Once a general defense is fairly raised, it is incumbent upon the State to negate, beyond a reasonable doubt, the application of a general defense." *State v. Cole-Pugh*, 588 S.W.3d 254, 264 (Tenn. 2019). Tennessee's self-defense statute provides, in relevant part:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;
> >
> > (B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1)-(2) (2022). Acts committed in self-defense are justified, and self-defense is a complete defense to crimes of violence. *See* Tenn. Code Ann. § 39-11-601 (2022); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

As the State notes in its brief, Defendant's argument presents the *Reynolds* court's list of circumstances supporting premeditation as a factor test; Defendant surveys each circumstance and asserts that, because more factors weigh in his favor than in the State's favor, this court should conclude that the evidence of premeditation was insufficient. However, our supreme court was clear that the list of circumstances is not a formula and that the jury "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.*

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Viewed in the light most favorable to the State, a rational jury could find beyond a reasonable doubt that Defendant was the person who killed the victim, that he did so after the exercise of reflection and judgment, and that he did not act in self-defense. Although Defendant correctly notes that the witness testimony was inconsistent in several respects, issues of witness credibility, resolving conflicts in the testimony, and the weight to be afforded to the evidence are the exclusive province of the trier of fact, and we will not disturb those determinations on appeal. *Bland*, 958 S.W.2d at 659.

The evidence at trial established that Ms. Arnold was angry with the victim over the theft of her camper and that she asked Mr. Eldridge to contact Defendant to "beat the brakes off" the victim. Defendant's text messages to Ms. Arnold reflected that he had a "sling shot" and wanted to go with her.

Multiple witnesses saw Ms. Arnold drive up to the house in her black Honda. Across the street, E.D. saw a person carrying a backpack exit the car and walk around the back of the residence shortly before hearing a gunshot. Mr. Eldridge identified the person who exited Ms. Arnold's car and walked to the rear entrance as Defendant. Mr. Eldridge admitted that he told the police that Defendant was carrying a backpack.

Mr. Boyko and Mike testified that a short and stocky man wearing a face covering of some sort entered the residence holding a shotgun and briefly exchanged words with the victim.[9] Special Agent Webb described Defendant as a "short chunky man." Mr. Boyko observed a brief struggle between the men before they broke apart, and both Mr. Boyko and Mike recounted the victim's telling the man to "go ahead and shoot him" before the man shot the victim once. No firearms were found in the residence, and a small pocketknife was found beside the victim's body. However, Dr. Deering and Special Agent Webb both opined that the shot was fired from a distance; Dr. Deering estimated that the shotgun's barrel was between five and ten feet from the victim. Defendant does not dispute that he failed to render aid to the victim.

Additionally, Mr. Snow testified that Defendant asked him for a ride to Florida some hours later and that Defendant was carrying a backpack. Further, when arrested in Georgia,

---

[9] Mr. Wyatt was separately identified as being present but not as being the shooter.

Defendant volunteered that he knew the arrest had to do with Tennessee and told officers that he had gone to confront someone about stealing his camper, that the person had pulled a knife, and that he had acted in self-defense. The evidence was sufficient to support the jury's verdict relative to Defendant's identity and premeditation, and Defendant is not entitled to relief on this basis.[10]

### *Improper Argument/Mistrial*

Defendant contends that the trial court erred by failing to declare a mistrial after the prosecutor improperly stated in rebuttal argument that Defendant told officers in Georgia that he "shot [the victim] in self-defense."

The State responds that Defendant has waived plenary review of this issue for failure to request a mistrial after the trial court gave a curative instruction; the State also notes that Defendant has not requested plain error review. In the alternative, the State argues that the prosecutor's remark was not inaccurate in its overall meaning and within the bounds of permissible argument, that the prosecutor's misstatement was unintentional, and that any error was cured by the trial court's instruction.

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022)). Because counsel in criminal cases are "expected to be zealous advocates," they are afforded "great latitude in both the style and the substance of their arguments." *Id*. (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131). "Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted).

Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading

---

[10] We note that, although defense counsel requested a self-defense jury instruction and raised the possibility in closing argument that Defendant shot the victim after the victim pulled out a knife, the bulk of Defendant's argument involved casting doubt on his identity as the shooter. In addition, Defendant has not raised on appeal that the jury should have acquitted him as having acted in self-defense.

the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id.* The following factors should be considered when making this determination:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6. A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001).

As a preliminary matter, Defendant's argument centers on the failure of the trial court to declare a mistrial based upon the improper rebuttal argument. Defendant did not request a mistrial in his initial objection or after the trial court issued its curative instruction. Accordingly, this issue has been waived, and we will examine it for plain error. *See Banks*, 271 S.W.3d at 137 (concluding that plenary review of the defendant's contention that the trial court erred by failing to declare a mistrial based upon the State's improper argument was waived when defense counsel failed to request a mistrial after a curative instruction was issued); *see also* Tenn. R. App. P. 36(a).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee

Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

We do not think plain error relief is required here. Although the prosecutor's statement that Defendant said during his Georgia arrest, "I shot him in self-defense because he pulled a knife on me" was a misstatement of the evidence, the trial court promptly issued a curative instruction that the arguments of counsel were not evidence and that the jury should rely on the evidence at trial if the arguments of counsel conflicted with the evidence. The jury is presumed to follow the trial court's instructions. *See Banks*, 217 S.W.3d at 137. We acknowledge the State's position that, when a person claims to have acted in self-defense, a reasonable inference is that the person took action that harmed the victim. However, a prosecutor should not quote a defendant's verbatim statement incorrectly. In addition, the jury heard correct restatements of Defendant's actual words from both the prosecutor and defense counsel during closing arguments, as well as during Officer Telfair's testimony, and the jury heard the body camera recording and had it with them to consult during its deliberations.[11] Accordingly, substantial justice does not require consideration of the error, and Defendant is not entitled to plain error relief.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

s/*Robert L. Holloway, Jr.*
ROBERT L. HOLLOWAY, JR., JUDGE

---

[11] We note that the potential prejudicial effect of the improper argument was also lessened by the jury's being instructed on self-defense; Defendant did not rely solely upon identity as a defense and allowed for the possibility that he shot the victim.